# AFFIDAVIT IN SUPPORT OF
# CRIMINAL COMPLAINT AND ARREST WARRANT

I, Elizabeth Ballinger-Brotman, being duly sworn, hereby depose and say as follows:

## I. INTRODUCTION

1)   I am a Special Agent with the United States Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI") and have been so employed for approximately 10 years. During this time, I have investigated violations of Federal laws. As an FBI Special Agent, I am authorized to investigate violations of the laws of the United States of America. I am a sworn law enforcement officer with authority to execute arrest and search warrants issued under the authority of the United States of America. I am currently assigned to the Washington Field Office to a squad responsible for investigating Corporate Fraud and Intellectual Property Rights violations. Prior to becoming a Special Agent, I was employed by the FBI as a professional staff employee for approximately 10 years.

2)   This Affidavit is submitted in support of a criminal Complaint charging TINITA JOYNER with Wire Fraud in violation of 18 U.S.C. § 1343. I respectfully submit that the Affidavit establishes probable cause to believe that TINITA JOYNER has violated 18 U.S.C. § 1343, and request that the Court issue an arrest warrant for TINITA JOYNER, pursuant to Federal Rule of Criminal Procedure 4(a).

3)   The facts and information contained in this Affidavit are based on my personal knowledge and observations made during the course of this investigation, information provided by witnesses, and the review of records and documents obtained during this investigation. Where conversations or statements are related herein, they are related in substance and in part, except where otherwise indicated. The dates listed in the Affidavit should be read as "on or about" dates. I have not included every fact known to me about this investigation, but rather

only those facts that are sufficient to establish probable cause that TINITA JOYNER has engaged in wire fraud in violation of 18 U.S.C. § 1343.

## II. RELEVANT LAW

4) Title 18, United States Code, Section 1343 provides:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

## III. FACTUAL BACKGROUND

5) To summarize, as outlined below, TINITA JOYNER, 51 years old, residing at Rockville, Maryland, was the full-time Office Manager for Company A, a consulting firm in Washington, D.C., from September 2012 until February 2014. As the Office Manager, TINITA JOYNER was responsible for the company's operational finances, including accounts payable and accounts receivable. She collected the company's mail, was responsible for overseeing payment of the company's bills, and had access to the company's operating bank account and credit card account.

6) Company A provided consulting services to clients in identifying and obtaining projects in emerging markets worldwide. Company A also had offices in Milan, Italy, and Mumbai, India. The company had less than ten employees in its Washington, D.C. office. Company A's president primarily resides in Italy.

**IV. SCHEME TO DEFRAUD**

7)   Company A maintained a business credit account with American Express. Credit cards were issued in the names of various individual employees for business travel and related business purposes, but all of the credit cards were tied to the main Company A account. TINITA JOYNER was responsible for a card in the name of "Operations" that was to be used to purchase office supplies. This card was also tied to the main company account. I have reviewed records relating to this account.

8)   Beginning in September 2012, the "Operations" card, to which TINITA JOYNER had access, was used to make unauthorized personal purchases, primarily at retail stores, at restaurants, and to make purchases over the Internet. A company employee identified charges, not related to the operations of Company A, made with the "Operations" card during the time TINITA JOYNER was using the card. In addition to the "Operations" card, American Express issued another card under Company A's business credit account. This card was issued in the name of "Tinita Joyner" with charges beginning October 10, 2012, and ending October 18, 2012, after which time, no further activity appeared. Subsequently, American Express issued a new card number, under Company A's business account, in the name of Tinita Joyner, with charges being made beginning October 20, 2012.

9)   The cards, issued in the name of "Tinita Joyner," were used to make unauthorized purchases primarily at retail stores and restaurants located in Rockville, Kensington and Gaithersburg, Maryland, and Washington, D.C., and over the Internet. By way of example, credit card records indicated the "Tinita Joyner" card was used to make a charge to a printing company, located in Rockville, Maryland, on April 12, 2013, in the amount of $85.96. Your affiant reviewed merchant records that indicated the payment was made for the printing of flyers,

which advertised a church function, to be held in Gaithersburg, Maryland. The flyer provided the name "Tinita Joyner" as the contact for the function. An American Express representative explained the credit card transaction process to me. During the relevant period, all American Express charges were sent electronically from the point of sale terminal to Arizona for authorization approval and processing.

10) Between September 2012 and August 2013, approximately $37,309 of unauthorized charges were made with the "Operations" American Express card. These charges consisted of purchases from retail stores and restaurants in Gaithersburg, Maryland, Rockville, Maryland, and Washington, D.C. For example, on February 12, 2013, concert tickets were purchased for recording artist "Beyoncé" with the "Operations" card in the amount of $2,536.60. Merchant records indicated that the customer name listed for the concert tickets was "Tinita Joyner."

11) Between October 2012 and September 2013, approximately $63,590 of unauthorized charges were made with the Company A card issued in the name of "Tinita Joyner." For example, on July 20, 2013, charges were made with the "Tinita Joyner" card to a pawn broker located in Maryland, in the amount of $2,120. Merchant records indicated that two tennis bracelets were sold to TINITA JOYNER, on July 20, 2013, for the total cost of $2,120. Between October 2012 and September 2013, TINITA JOYNER was responsible for facilitating the payment of Company A's American Express bills.

12) Between September 2012 and September 2013, American Express credit card payments were made from Company A's operating checking account, held at a Citibank branch located in Washington, D.C., to American Express. All payments were made by wire transfer,

either through online payments or through customer service payments. I reviewed records relating to the American Express and Citibank accounts.

13) On or about September 9, 2013, a business credit account in the name of Company A was opened with Capital One Bank. The account was opened online. Company A's president was named as the primary account holder and TINITA JOYNER was listed as an authorized user. A card was issued in the name of Company A's president and another card was issued in TINITA JOYNER's name. The company's president did not apply for a Capital One credit card nor did he ever receive a Capital One credit card. Company A's president did not approve TINITA JOYNER to open a Capital One credit card account. Between September 2013 and March 2014, approximately $12,347 of unauthorized charges were made with the Capital One card issued in the name of Company A's president. The card was used to make purchases primarily at retail stores and restaurants in Rockville, Gaithersburg, and Germantown, Maryland, and at retailers in Washington, D.C. The card was also used to make purchases online through PayPal. Company A's president was not aware of the Capital One credit card until February 2014.

14) Between September 2013 and March 2014 approximately $7,437 of unauthorized charges were made with the Capital One card issued in the name "Tinita Joyner." The card was used to make purchases primarily at retail stores in Rockville, Gaithersburg, and Germantown, Maryland. In November 2013, the card was used to purchase airplane tickets in the name of a relative of TINITA JOYNER, in the amounts of $536.80 and $187.80.

15) Between September 2013 and January 2014, approximately $17,140 in unauthorized payments were made from Company A's operating Citibank checking account, to which TINITA JOYNER had access, to the Capital One credit card account. All payments were

made online through wire transfer from the Citibank account to Capital One. I reviewed records relating to the Capital One and Citibank accounts.

16) Between October 2013 and January 2014, approximately $16,027 in unauthorized online payments were made from Company A's Citibank account, to which TINITA JOYNER had access, to US Bank for a Visa account held in the name of "Tinita Joyner." The card was used primarily to make purchases at retail stores in Germantown, Rockville and Kensington, Maryland, Washington, D.C. and online. Company A's president never authorized TINITA JOYNER to use Company A's funds to pay her personal bills nor did he authorize her to pay a Visa bill. I have reviewed the Visa credit card account records and the Citibank records.

17) From 2012 through 2014, TINITA JOYNER had access to Company A's operating account held at Citibank. Payments were made from this account to cover unauthorized charges made on the American Express credit cards issued in the name "Operations," the American Express card issued in TINITA JOYNER's name, the Capital One credit card issued in the name of Company A's president, the Capital One card issued in TINITA JOYNER's name, and the US Bank Visa held in TINITA JOYNER's name.

18) When interviewed by FBI Agents in March 2015, Joyner acknowledged that there were personal charges on Company A's credit cards that were for Joyner's personal benefit. Joyner also acknowledged that she paid Company A's bills both with checks and through online transfers. I have reviewed Joyner's interview. Based upon the foregoing, as part of the scheme to defraud, I believe TINITA JOYNER caused funds to be transmitted in interstate commerce by means of wire communication from Company A's operating bank account to pay for unauthorized purchases made with company credit cards and a personal credit card.

## V.  CONCLUSION OF AFFIANT

19) Based on the foregoing facts, your Affiant respectfully submits that there is probable cause to believe that JOYNER has committed Wire Fraud in violation of 18 U.S.C. § 1343.  That violation took place, in part, within the District of Columbia.

       Respectfully submitted,

       _____
       Special Agent Elizabeth Ballinger-Brotman
       Federal Bureau of Investigation

Sworn to and subscribed before me on the _____ day of August 2016

_____
The Honorable Thomas F. Hogan
United States District Court Judge